E-FILED
Friday, 01 September, 2017  11:31:42 AM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

| | |
|---|---|
| CATHERINE COLEMAN, | ) |
| Plaintiff, | ) ) ) |
| v. | ) )  Case No. 1:15-cv-01001-SLD-JEH |
| CATERPILLAR, INC., a corporation | ) ) ) |
| Defendant. | ) ) |

ORDER

Before the Court are Defendant Caterpillar, Inc.'s ("Caterpillar") motion for summary judgment, ECF No. 27, and Plaintiff Coleman's motion for extension of time to file an addendum, ECF No. 34. For the reasons that follow, the motions are GRANTED.

BACKGROUND[1]

Caterpillar manufactures construction and mining equipment, engines, turbines, and locomotives. *2017 Caterpillar Fact Sheet*, Caterpillar.com, http://s7d2.scene7.com/is/content/Caterpillar/CM20170623-48500-33391 (visited Aug. 22, 2017). Coleman worked as an IT analyst at a Caterpillar facility in East Peoria, Illinois from August 25, 2008 to December 1, 2011. In late 2011, Caterpillar eliminated Coleman's position but, pursuant to its policies, placed her in a pool of priority candidates for other jobs within the company. She applied for and got a job as an "advanced purchasing analyst" in Caterpillar's Global Purchasing department in

---

[1] At summary judgment, a court "constru[es] the record in the light most favorable to the nonmovant and avoid[s] the temptation to decide which party's version of the facts is more likely true." *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). The facts related here are, unless otherwise noted, taken from Caterpillar's statement of undisputed material facts, Mot. Summ. J. 4–20; from Coleman's disputed material and immaterial facts and additional material facts, Resp. Mot. Summ. J. 3–8, 13–21, ECF No. 31; from Caterpillar's reply thereto, Reply Mot. Summ. J. 1–22 ECF No. 33; and from the exhibits to the motions. Where the parties disagree about the facts, the Court views the evidence in the light most favorable to Coleman, the non-moving party, and draws all reasonable inferences in her favor. *McCann v. Iroquois Mem'l Hosp.*, 622 F.3d 745, 752 (7th Cir. 2010) (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986)).

1

Mossville, Illinois, where she worked from December 1, 2011, until the termination that elicited this lawsuit. She had a number of different supervisors at this position, the last of whom was Jonathan Hillman, who supervised her from August 2012 onward.

Advanced purchasing analysts at Caterpillar are each responsible for a certain number of "buyer codes." Hillman Dep. 21:12–21, App. Mot. Summ. J. Ex. 4, ECF No. 28-4. These codes correspond to the numbered parts of certain Caterpillar products, and are associated with those products on purchase orders and invoices. *Id.* 21:22–23. Analysts are responsible for dealing with communications to Caterpillar from buyers in such areas as "grief resolution" and price discrepancies. *Id.* 22:8–14. Analysts also communicate directly with the Caterpillar engineers who design these products when an engineer makes a change to a part's design. *Id.* 21:12–21. The analysts and the engineers work in the same building, and engineers frequently come by to communicate in person with analysts. *Id.* 22:21–24:5. Analysts are also responsible for speaking in person with customers about the products corresponding to their buyer codes. The analysts have team meetings once a week, and, according to Hillman, "heavily leverage each other in interaction." *Id.* 36:2–3. Advanced purchasing analysts are also subject to "Learning Plans"—apparently, training—typically conducted both online and in person.

Coleman suffers, and appears to have suffered at all times relevant to this litigation, from a galaxy of illnesses and symptoms: migraine headaches, dizziness, balance problems, ear problems, anxiety, gastroesophageal reflux disease, allergies, motion sickness, nausea, a brain cyst, depression, mitral valve prolapse, irritable bowel syndrome, diverticulosis, and vertigo. Beginning before July 2012 and continuing until the date of her termination, Coleman was not supposed to drive a car. She also states that beginning in May 2013 and running until the date of her termination, she was not able to work at her place of employment in Mossville because

certain "triggers" caused her various conditions to "flare up." These triggers included walking around the office, being near many people, bright lights, noise, and driving a long distance.

In 2012, Coleman took disability leave from April 10 to April 18, and again from June 1 through July 10. After the July absence, Caterpillar allowed Coleman to resume work from home. At the beginning of this arrangement, on July 10, Caterpillar's Disability Case Coordinator sent Coleman an email stating: "Please understand that working from home is to be for a brief period of time." On the same date, her supervisor sent her an email asking for weekly updates and explaining that these updates would no longer be required once she came back to the office. However, Coleman continued to work from home throughout that autumn and into the next year. Hillman became Coleman's supervisor in August 2012. He wanted Coleman to return to work at Mossville and communicated this wish to Megan Parsons, a human resources employee at Caterpillar, in early 2013. Parsons told Coleman. However, Coleman continued to work from home. While she was out, Hillman would assign in-person inquiries associated with Coleman's buyer code to other advanced purchasing analysts. He also established a weekly phone conference with Coleman. During this period, Coleman would occasionally take sick leave days pursuant to the Family and Medical Leave Act ("FMLA"), as she had done during her employment with Caterpillar as far back as 2009.

On May 2, 2013, Coleman requested in a letter to Parsons that she be allowed to work from home all the time. As reasons, she cited not being able to drive long distances, and not being able to work in an office. Parsons conferred with Hillman, who opposed the idea, citing the importance of coworker interaction to Coleman's job, the need to interact with engineers face-to-face, and the need to meet in the same way with suppliers. On May 5, 2013, Coleman emailed Parsons again, repeating her request and seeking confirmation of their "ongoing

discussions." Parsons responded the next day, saying that Caterpillar would "continue to work with you on this," and granting Coleman's request to continue working from home while the parties discussed possible accommodations of Coleman's disabilities. Parsons inquired further about what Coleman's "triggers" were. Coleman responded the same day: bright lights and loud noise, "exposure to which [was] inevitable when physically present in the workplace," as well as large groups of people and having to walk places.

Parsons responded on May 9, 2013, proposing a set of accommodations to begin on May 15. Coleman would be allowed to work at home some of the time, but would have to come in to the Mossville office up to three days a week for training purposes and for "understanding of her buyer code." She would have to be at the office when suppliers visited the office and for important meetings. She would be given an office where she could turn off the lights, and would be given a medically restricted parking place to cut down on the distance between her car and the office. She would be provided with a wheelchair, and would be given a flexible start time so that she could use public transportation or some other means of transit to get herself to the office when she was able. Hillman seconded these offers in a separate email to Coleman.

On May 16, 2013, Coleman rejected the offer by email, citing her doctors' orders, and again asking to be allowed to work from home all the time. She also explained that she could not be a passenger in a vehicle for long rides due to her vertigo, motion sickness, dizziness, nausea, and migraines. Parsons reiterated Caterpillar's offer, evidently unchanged, in a phone call to Coleman the next day. Coleman still said no. On June 3, 2013, Parsons called and emailed the details of the offer again. On June 10, Coleman's counsel responded to Parsons directly, again rejecting the offers.

4

On July 12, 2013, Parsons made another proposal: Coleman could go to Mossville on "two individual days," and, in lieu of going to Mossville on other occasions to receive training, could get that training in person at Heartland Community College, which was near her home. Parsons Decl. ¶ 11, App. Mot. Summ. J. Ex. 9, ECF No. 28-9. Parsons rented space and prepared a training schedule.[2] Coleman went to Mossville for the two required training days, but wasn't able to stay all day because of her illnesses. She missed many of the training sessions at Heartland, so Caterpillar rescheduled them, although she had not completed them at the time of her termination.[3] Parsons became suspicious when, on July 19, 2013, she was given emails by another Caterpillar employee from Coleman's stepmother expressing doubt about the real extent of Coleman's illness, and stating that she had been active on days that she had taken FMLA leave. *See* Ventimiglia Dep. Ex. 3, App. Mot. Summ. J. Ex. 8, ECF No. 28-8 ("Example: too sick to go to work but Friday, June 29 not too sick to go to cheeks bar and dance and then to the windjammer, and other places…"). Parsons hired a private investigator to surveil Coleman.

On August 1, 2013, Coleman left a training session at Heartland early, ostensibly because she had a physical therapy appointment that afternoon. However, the private investigator tailed her and discovered that instead she got ice cream and went to the DMV with her husband. On August 5, 2013, Parsons told Coleman to meet with Dr. Dea, a Caterpillar physician, to better determine the nature of her medical requirements and work limitations. On August 12, Coleman refused, arguing that she had given her personal physicians consent to speak with Caterpillar doctors, and that this should be sufficient. Parsons responded the next day demanding that

---

[2] It is unclear from the parties' statements of facts and attached exhibits, including copies of emails back and forth between Coleman and Parsons, whether Parsons's offers were unilateral, or whether they were the result of some mutual agreement, in writing or otherwise, by which Coleman assented to the Heartland training schedule.

[3] Coleman lists this fact as disputed, but offers no evidence to contest it, merely repeating Caterpillar's version of events and citing to her deposition, which supports Caterpillar's assertions. The fact is, therefore, not genuinely contested. *See Packer v. Trustees of Indiana Univ. Sch. Of Med.*, 800 F.3d 843, 850 (7th Cir. 2015).

Coleman meet with Dea, and telling her that she "risked insubordination" if she refused. Coleman responded on August 16, indicating that she would meet with Dea, although she never did.

Around August 27, Parsons decided to fire Coleman, although she waited to do this until an in-person meeting at Mossville on September 4, 2013. Coleman's notes for this meeting, dated August 27, indicate that Parsons decided to fire Coleman because Coleman had been insubordinate in not meeting with Dea, and that as a consequence of this refusal, Caterpillar had been unable to determine what kind of accommodation would allow Coleman to continue working there. Parsons's notes also reiterate that Caterpillar was not willing to allow Coleman to work permanently from home, because "[t]hat would amount to creating a job that does not exist." Parsons Memo, Parsons Dep. Ex. 1, App. Mot. Summ. J. Ex. 5, ECF No. 28-5. Although Parsons was aware that Coleman had been using FMLA leave intermittently, Parsons stated in her deposition that the termination was "for cause," and unrelated to Coleman's use of FMLA time. Parsons was not responsible for considering or approving use of FMLA leave.

Coleman filed a charge of discrimination with the EEOC, which closed its file on the claim and issue a notice of right to sue on September 30, 2014. Compl. Ex. A, ECF No. 1-1. Suit followed in this Court on January 2, 2015. Compl., ECF No. 1. Coleman alleged (I) that Caterpillar violated the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101–213, by discriminating against her in firing her because of her disability and by failing to reasonably accommodate her disabilities, Compl. 5–7; and (II) that Caterpillar violated the FMLA, 29 U.S.C. §§ 2601–54, by refusing to allow her to exercise FMLA leave and terminating her for not meeting with Dea, and by refusing to consider rehiring her in a similar position, Compl. 7–10.

She also alleged retaliation theories as to both the ADA and FMLA claims. The motion for summary judgment followed on April 24, 2017.

## DISCUSSION

**I.      Legal Standard on a Motion for Summary Judgment**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). At the summary judgment stage the court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial—that is, whether there is sufficient evidence favoring the non-moving party for a jury to return a verdict in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Patel v. Allstate Ins. Co.*, 105 F.3d 365, 370 (7th Cir. 1997). The court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *McCann v. Iroquois Mem'l Hosp.*, 622 F.3d 745, 752 (7th Cir. 2010) (citing *Anderson*, 477 U.S. at 255). "A genuine issue for trial exists only when a reasonable jury could find for the party opposing the motion based on the record as a whole." *Pipitone v. United States*, 180 F.3d 859, 861 (7th Cir. 1999) (quoting *Roger v. Yellow Freight Sys., Inc.*, 21 F.3d 146, 149 (7th Cir. 1994).

**II.     Analysis**

Caterpillar seeks judgment against Coleman on both her ADA and FMLA claims, arguing, as to the ADA discrimination claim, that Coleman was not a qualified individual with a disability, and that she cannot show that she was meeting Caterpillar's legitimate performance expectations, or that other similarly situated employees were treated more favorably. Mot. Summ. J. 21–32. Caterpillar also argues that Coleman cannot show that its offered reason for her termination was pretextual. *Id.* As to Coleman's ADA retaliation claim, Caterpillar argues

that Coleman cannot establish a causal connection between any protected activity and her termination. *Id.* at 32–34. As to the FMLA claim, Caterpillar argues that it did not deny Coleman FMLA leave or other benefits, and, as with her ADA claim, cannot show a causal connection between any protected activity and her termination. *Id.* at 34–38.

### a. ADA Discrimination and Failure to Accommodate

Caterpillar first argues that Coleman's ADA discrimination and failure to accommodate claims fail because Coleman cannot show that she was a qualified individual with a disability.

> The ADA both proscribes adverse employment treatment of an employee on the basis of the employee's physical or mental disability, 42 U.S.C. §§ 12112(b)(1)-(4), and imposes an affirmative duty on employers to make reasonable accommodations for the disabilities of an employee who can perform the essential functions of her job with or without accommodation.
> 42 U.S.C. §§ 12112(b)(5)-(7).

*Feldman v. Am. Mem'l Life Ins. Co.*, 196 F.3d 783, 789 (7th Cir. 1999). Coleman's complaint alleges both discriminatory adverse treatment (firing) and a failure to accommodate her disabilities by letting her work from home. For either claim to be successful, Coleman must make a prima facie showing that she is or was a qualified individual with a disability. *Hoffman v. Caterpillar, Inc.*, 256 F.3d 568, 572 (7th Cir. 2001) (explaining that both discrimination and failure to accommodate claims under the ADA must begin by making this showing).

Under the ADA, a qualified individual with a disability is "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). A "disability" means "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an

8

impairment." *Id.* § 12102(1). And "essential functions" are determined not just by looking at an employer's job description, but by looking to a number of factors:

> (i) The employer's judgment as to which functions are essential;
>
> (ii) Written job descriptions prepared before advertising or interviewing applicants for the job;
>
> (iii) The amount of time spent on the job performing the function;
>
> (iv) The consequences of not requiring the incumbent to perform the function;
>
> (v) The terms of a collective bargaining agreement;
>
> (vi) The work experience of past incumbents in the job; and/or
>
> (vii) The current work experience of incumbents in similar jobs.

*Miller v. Illinois Dep't of Transp.*, 643 F.3d 190, 197–98 (7th Cir. 2011) (quoting 29 C.F.R. § 1630.2(n)(3)). Although courts look to see if an employer "actually requires all employees in a particular position to perform the allegedly essential functions . . . [courts] do not otherwise second-guess [an] employer's judgment in describing the essential requirements for the job." *DePaoli v. Abbott Labs.*, 140 F.3d 668, 674 (7th Cir. 1998).

"Reasonable accommodation" is a broad category that may include making existing work facilities accessible to individuals with disabilities, 42 U.S.C. § 12111(9)(A), or "job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities." *Id.* § 12111(9)(B). In providing reasonable accommodation, employers will often have to engage in an interactive process with disabled employees. The regulations implementing the ADA state that the process "should identify the precise limitations resulting from the disability and potential reasonable

9

accommodations that could overcome those limitations." 29 C.F.R. § 1630.2(o)(3). In determining whether an employer engaged in an interactive process sufficient for reasonable accommodation, "[n]o hard and fast rule will suffice . . . . Rather, courts should look for signs of failure to participate in good faith or failure by one of the parties to make reasonable efforts to help the other party determine what specific accommodations are necessary." *Beck v. Univ. of Wisconsin Bd. of Regents*, 75 F.3d 1130, 1135 (7th Cir. 1996).

It is undisputed that Coleman did suffer and now suffers from a disability. Caterpillar contends that because of her disability, she could not perform the essential job functions of an advanced performance analyst with or without reasonable accommodations. In Caterpillar's view, Coleman's job required her to be physically present in the Mossville office at least some of the time, in order to collaborate with co-workers, attend meetings, meet with suppliers and develop relationships with them, receive the in-person portion of the training required by the position, and deal with crises that might arise in the supply chain. Mot. Summ. J. 22. Because Coleman's ailments prevented her from discharging this essential job function, she was not able to perform the job with or without reasonable accommodation. *Id.* Coleman does not contest that she was unable to be physically present in Mossville, but rather disagrees that any physical presence at Mossville at all was an essential function of her employment, pointing to the fact that Caterpillar's written description of the position does not specify that physical presence at the workplace is required, and that she had managed to do that job without being present at Mossville for approximately a year prior to her termination. Resp. Mot. Summ. J. 28, ECF No. 31.

Courts "presume that an employer's understanding of the essential functions of the job is correct, unless the plaintiff offers sufficient evidence to the contrary." *Gratzl v. Office of Chief*

*Judges of 12th, 18th, 19th, & 22nd Judicial Circuits*, 601 F.3d 674, 679 (7th Cir. 2010) (citing *Basith v. Cook Cty.*, 241 F.3d 919, 928 (7th Cir. 2001)). Here, Caterpillar has offered substantial evidence supporting its understanding that at least occasional physical presence in Mossville was essential to the job of advanced purchasing analyst, and Coleman has not offered sufficient evidence to the contrary.

All of the other advanced purchasing analysts employed by Caterpillar worked in an office, coordinating with buyers, engineers, and their own managers on questions and problems that arose around individual Caterpillar parts and products. It is clear from Hillman's description of the workplace and from the official written job description that the day-to-day aspects of this job involved frequent in-person interaction with Caterpillar employees both inside and outside the Mossville office, and with buyers. *See* Job Description, App. Mot. Summ. J. Ex. 3, No. 11, ECF No. 28-3. In Hillman's view as manager, it was important for employees to talk to each other, to meet as a team when crises arose, and to be available to meet with engineers and buyers. Hillman Dep. 21–24. The job description indicates that an advanced purchasing analyst must "work[] effectively with colleagues, customers, and support at all levels," and needs to have effective oral communication skills. In short, physical presence in the office at least some of the time was an essential part of being an advanced purchasing analyst. In addition, as Coleman does not dispute, at least some of the training Caterpillar routinely administers to its analysts was required to be in-person, whether it was delivered at Mossville or elsewhere.

Coleman's two pieces of counter-evidence are insufficient. First, the job description, while significant, is only one piece of evidence as to what Caterpillar's estimation of the essential functions of the job were, and Caterpillar's view only one kind of evidence amongst several. 29 C.F.R. § 1630.2(n)(3). And although the job description does not explicitly state that

11

physical presence at the office is required of an advanced purchasing analyst, as explained above, the requirements and advantageous attributes it describes in candidates for the position make sense only when considered in the context of physical presence in the workplace. In addition, the description itself states at the bottom that it is "intended as a general guide to job duties . . . and is intended for the purpose of establishing the specific salary grade. It is expressly not intended to be a comprehensive list of 'essential job functions' as that term is defined by the [ADA]." Job Description 1.

Second, although Coleman is correct that she had performed her job remotely for many months prior to her termination without her performance being deemed officially unsatisfactory, this fails to show that occasional physical presence in Mossville was not an essential function of the job, and thus, to carry her burden of establishing that she was able to perform these essential functions. *See Taylor-Novotny v. Health All. Med. Plans, Inc.*, 772 F.3d 478, 493 (7th Cir. 2014) ("Ms. Taylor–Novotny bears the initial burden of establishing that she was a qualified individual who could perform the essential functions of her position."). Coleman points to Hillman's end-of-2012 performance evaluation, in which he did not state that she was not meeting expectations, and notes that she was still performing some of the essential functions of the job. Resp. Mot. Summ. J. 28. But Hillman actually concluded that Coleman received "a valued performance review but with assistance." Hillman Dep. 31:7–8. This meant that "she required others to support her in some of [her] tasks . . . . [and] needed to reach out to team members to ask more frequent questions to aid her in completing the task." *Id.* 31:12–15. And simply because it took Caterpillar a long time to fire Coleman does not prove that her way of doing the job, which Caterpillar ultimately refused to assent to, allowed her to perform all the essential functions of the job. Indeed, had Caterpillar terminated her immediately without engaging in the lengthy

12

interactive process it ultimately did, it likely would have violated the ADA by refusing to attempt to accommodate her disability. Efforts to comply with the ADA in finding a way for a disabled employee to perform essential job functions are not evidence that, in fact, those essential functions do not exist.

Coleman also fails to point to any other advanced purchasing analysts who worked from home with Caterpillar's acquiescence. In her deposition, she identified Nancy Johnson as such an individual, Coleman Dep. 52:10–54:1, but Johnson was a purchasing analyst, employed by a staffing agency with which Caterpillar contracted, and did travel to Mossville multiple times in 2012 and 2013 for team meetings. *See* Mot. Summ. J. 19. Coleman presents no other evidence suggesting, against the weight of Caterpillar's official job description and Hillman's description of what the job entailed, that occasional appearance at work was not an essential function of her job.

*Kauffman v. Petersen Health Care VII, LLC*, 769 F.3d 958 (7th Cir. 2014), upon which Coleman relies, is inapposite. There, the district judge ruled that plaintiff, a hairdresser who worked at a nursing home cutting the hair of the occupants, could not perform an essential function of her job because she could not wheel the occupants to and from the beauty parlor where she worked. *Id.* at 961. The Seventh Circuit reversed, holding that there was a factual dispute as to the amount of time the plaintiff had spent wheeling, and thus, a trial was required to determine it, and by extension to determine whether such wheeling was an essential part of her job or, rather, a part that could be delegated to someone else as a reasonable accommodation. *Id.* at 692. Here, by contrast, there is no dispute as to the highly interactive, office-based nature of the work done by Caterpillar's advanced performance analysts, the frequency with which analysts were called upon to interact with engineers and customers in person, or the requirement

13

for in-person training to be conducted. Indeed, Coleman offers nothing to create a dispute of material fact as to the necessity of appearing at Mossville, other than her own subjective impression that she did not need to show up, and the fact that she actually did not show up for a period of time. This is insufficient to survive summary judgment. *See Credeur v. Louisiana Through Office of Attorney Gen.*, 860 F.3d 785, 792–95 (5th Cir. 2017) (holding that DOJ litigation attorney's subjective judgment that her job did not require regular office attendance did not create material dispute of fact as to whether such attendance was an essential function of the job).

In addition, the Court notes that, since Coleman has maintained consistently that she could not perform the job of advanced purchasing analyst without reasonable accommodation, she must show that she could do it with some accommodation, in order to show that she is a qualifying individual with a disability. 42 U.S.C. § 12111(8). This means that, as to her failure to accommodate claim, Coleman has the burden at summary judgment of showing that the accommodation she sought was reasonable on its face. *Taylor-Novotny*, 772 F.3d at 493. She must also show that she engaged in an interactive process with Caterpillar in good faith, and did not herself, by bad faith or other actions, cause the negotiations to break down. *Beck*, 75 F.3d at 1135. It appears from the evidence submitted by the parties with their motions that Coleman essentially refused to negotiate with Caterpillar, rejecting all its offers of accommodation and demanding to work from home, as well as scheduling but then failing to attend a number of training sessions, and refusing to meet at all with Dea. While the Court construes disputed questions of fact in Coleman's favor, and does not go so far as to find that she negotiated in bad faith, it is plain that the interactive process broke down largely on the basis of her inability or unwillingness to accept any accommodation other than working from home all of the time. And,

14

as explained above, in resolving only to work from home, Coleman has refused, or proven unable as a consequence of her disability, to perform the essential functions of an advanced purchasing analyst.

Because a reasonable jury could not find that Coleman could perform the essential functions of an advanced purchasing analyst at Caterpillar with or without reasonable accommodation, her ADA claims for discriminatory treatment and failure to accommodate fail.

### b. ADA Retaliation

It is unlawful under the ADA for employers to retaliate against their employees for opposing any act or practice made unlawful by the ADA. 42 U.S.C. § 12203(a). This is so regardless of whether the act opposed ultimately gives rise to a meritorious ADA discrimination claim. *Squibb v. Mem'l Med. Ctr.*, 497 F.3d 775, 786 (7th Cir. 2007). At summary judgment, Coleman's only argument that Caterpillar retaliated against her for opposing an unlawful act under the ADA is that it fired her for refusing to meet with Dea. Resp. Mot. Summ. J. 34. Coleman points to an ADA definition of discrimination which provides that an employer shall not "require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity." 42 U.S.C. § 12112(d)(4)(A). However, as Caterpillar observes, Caterpillar's request that Dea consult with Coleman was both plainly job-related and consistent with business necessity.

While the employer bears the burden of showing that an examination is consistent with business necessity, and the burden is "quite high," *Wright v. Illinois Dep't of Children & Family Servs.*, 798 F.3d 513, 523 (7th Cir. 2015) (quoting *Conroy v. New York State Dep't of Corr.*

15

*Servs.*, 333 F.3d 88, 97 (2d Cir. 2003)), no reasonable jury could find that Caterpillar has not met that burden here. "Courts . . . require that an employer provide 'significant evidence that could cause a reasonable person to inquire as to whether an employee is still capable of performing his job.'" *Wright*, 798 F.3d at 523 (quoting *Sullivan v. River Valley Sch. Dist.*, 197 F.3d 804, 811 (6th Cir. 1999)).

In Coleman's case, overwhelming evidence caused Caterpillar to question reasonably whether Coleman was still capable of doing her job. Despite being told when she first started working from home that the accommodation was meant to be temporary, Coleman had not come in to work for approximately a year when Parsons demanded that she meet with Dea. Coleman had repeatedly missed training sessions and repeatedly refused to come in to work; she asserted that her various symptoms and maladies were so debilitating that she could not drive a car, or be driven by others—taken literally, she had said that she could not travel at all. As explained above, Caterpillar justifiably regarded a complete inability to move from home to office as an impediment to performing a basic function of Coleman's job, and asked that Dea "meet with [Coleman] to understand from [her] exactly what [her] medical condition is that may prevent [her] from performing [her] job duties in Mossville[.]" Parsons Letter Aug. 13, 2013, App. Mot. Summ. J. Ex. 3, No. 26, ECF No. 28-3. This is not a case where Coleman was suspected of having some disability on more or less convincing grounds, and Caterpillar ordered an evaluation despite her desire not to submit to any such examination; rather, this is a case where Caterpillar's employee had repeatedly admitted to a disability, and in an effort to figure out how to accommodate it, Caterpillar requested that Coleman consent to an initial meeting with its physician so that Dea, in coordination with Coleman's own doctors, could fashion a reasonable accommodation.

Such a request on Caterpillar's part was consistent with business necessity, and a reasonable jury could not find otherwise. Therefore, Coleman's refusal to meet with Dea was not opposition to a practice made unlawful by the ADA, and Caterpillar's termination of Coleman for that behavior cannot have been retaliation under 42 U.S.C. § 12203(a). The claim fails.

### c. FMLA Interference

The FMLA entitles any employee suffering from a serious health condition that renders him unable to perform the functions of his job to twelve workweeks of leave during every twelve-month period. 29 U.S.C. § 2612(a)(D). It is unlawful for an employer to interfere in an employee's exercise of this this right. *Id.* § 2615(a)(2). While Coleman's initial Complaint suggested that Caterpillar had refused to allow Coleman to exercise her FMLA right to take leave—"CATERPILLAR refused to allow COLEMAN to utilize any additional FMLA leave of absence," Compl. 8—this appears just to have meant that Caterpillar wouldn't rehire Coleman or let her take leave once it had fired her. Nowhere in her filings at summary judgment does Coleman suggest that she was prevented from taking leave under the FMLA, as she did, by the admission of both parties, on a fairly frequent basis during the year that she was working from home. She has not, at any rate, made out or supported a claim for FMLA interference that can survive summary judgment.

### d. FMLA Retaliation

As with the ADA, it is forbidden for an employer to retaliate against an employee for taking actions protected by the FMLA. 29 U.S.C. § 2615(a)(2). Coleman argues that requiring her to meet with Dea constitutes "a prima facie case of interference with and retaliation against Coleman for her use of her intermitted FML during the period from April 22, 2013 to her

termination date on September 4, 2013." Resp. Mot. Summ. J. 36. However, being asked to meet with Caterpillar's doctor, and being fired for not meeting with the doctor, were not in any sense acts of interference with Coleman's taking of leave under the FMLA. If they were anything, they were acts of retaliation for taking that leave. *See Burnett v. LFW Inc.*, 472 F.3d 471, 477 (7th Cir. 2006) (stating that an element of an FMLA interference claim is that an employer denied plaintiff FMLA benefits to which he was entitled). However, Coleman has not provided sufficient evidence to show that a reasonable jury could find Caterpillar retaliated against her under the FMLA, either.

To make out an FMLA retaliation claim, a plaintiff must either show that her employer took materially adverse action against her on account of a protected activity, *Burnett*, 472 F.3d at 481, or may proceed by way of the familiar *McDonnell Douglas* burden-shifting method. *King v. Preferred Tech. Group*, 166 F.3d 887, 892 (7th Cir. 1999). Under this method, a plaintiff must establish (1) that she engaged in a protected activity, (2) that the employer took an adverse action against her, and (3) that there is a causal connection between the two. *Id.* The connection must be but-for causation. *Id.* If the plaintiff does so, the employer must articulate a legitimate, non-discriminatory reason for the action; if the employer does so, then the burden shifts back to the plaintiff to demonstrate that the offered reason is pretextual. *Id.*

Here, Coleman cannot show any kind of causal connection between her termination and her taking of FMLA leave, and so cannot show that Caterpillar terminated her because she took it, or that it was the but-for cause of her termination. Coleman had taken FMLA leave throughout her years of employment with Caterpillar. Both Hillman and Parsons testified that while they were aware of the process by which employees took FMLA leave, and were aware of when Coleman did so, they had no role in approving or accounting for her FMLA days. Parsons

18

indicated consistently, at the time of Coleman's termination and afterward, that Coleman had been fired for refusing to meet with Dea. In short, Coleman has presented no evidence suggesting Parsons or Caterpillar terminated her because she exercised her rights under the FMLA by taking leave, and certainly, nothing to make out a prima facie case that her taking of leave was the but-for cause of her termination.

Coleman's FMLA retaliation claim fails.

## CONCLUSION

Accordingly, Defendant's motion for summary judgment, ECF No. 27 is GRANTED. Plaintiff's motion for extension of time to file an addendum containing supplemental authority, ECF No. 34, is GRANTED. No further claims remaining, the Clerk is directed to enter judgment and close the case.

Entered this 1st day of September, 2017.

s/ Sara Darrow
SARA DARROW
UNITED STATES DISTRICT JUDGE